UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

No. 16-1024(L)
_____

OHIO VALLEY ENVIRONMENTAL COALITION,
WEST VIRGINIA HIGHLANDS CONSERVANCY,
and SIERRA CLUB,

*Plaintiffs-Appellees*,

v.

FOLA COAL COMPANY, LLC,

*Defendant-Appellant*,
_____

Appeal from the United States District Court for the Southern
District of West Virginia at Huntington (2:13-cv-5006)
_____

**RESPONSE BRIEF OF PLAINTIFFS-APPELLEES**
**OHIO VALLEY ENVIRONMENTAL COALITION, <u>et al.</u>**
_____

Joseph M. Lovett                James M. Hecker
J. Michael Becher               Public Justice
Appalachian Mountain Advocates  1620 L Street, N.W.  Suite 630
P.O. Box 507                    Washington, DC 20036
Lewisburg, WV 24901             (202) 797-8600
(304) 645-9006


Counsel for Plaintiffs-Appellees
Ohio Valley Environmental Coalition, <u>et al</u>.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __16-1024__        Caption: __Fola Coal Company, LLC v. Ohio Valley Environmental Coalition__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Ohio Valley Environmental Coalition__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
       (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                      ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ James M. Hecker                    Date: ____January 21, 2016____

Counsel for: Appellees

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on ___January 21, 2016___ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

s/ James M. Hecker                              January 21, 2016
(signature)                                          (date)

07/19/2012                          - 2 -
SCC

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 16-1024     Caption: Fola Coal Company, LLC v. Ohio Valley Environmental Coalition

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sierra Club
(name of party/amicus)

who is _____ appellee _____ , makes the following disclosure:
    (appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations? ☐ YES ☑ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
     If yes, identify all such owners:

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ James M. Hecker                    Date:    January 21, 2016

Counsel for: Appellees

## CERTIFICATE OF SERVICE
****************************

I certify that on    January 21, 2016    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ James M. Hecker                              January 21, 2016
        (signature)                                    (date)

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
### DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __16-1024__        Caption: __Fola Coal Company, LLC v. Ohio Valley Environmental Coalition__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__West Virginia Highlands Conservancy__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
         (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ James M. Hecker                              Date: ___January 21, 2016___

Counsel for: Appellees

## CERTIFICATE OF SERVICE
***************************

I certify that on ___January 21, 2016___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/ James M. Hecker                                             January 21, 2016
(signature)                                                              (date)

# Table of Contents

Table of Authorities ............................................................................. iii

Jurisdictional Statement ........................................................................1

Statement of Issues Presented for Review ..............................................2

Counter-Statement of the Case ..............................................................3

Summary of Argument............................................................................8

Argument     ........................................................................................11

I.     The District Court's Decision on Fola's Liability Should Be Affirmed .......11

    A.     Standard of Review ..........................................................11

    B.     The Narrative Condition in Fola's CWA Permit Is Enforceable ........11

        1.     The Narrative Condition Must Be Read to Prohibit Fola From Causing a Violation of Water Quality Standards............11

        2.     The Case Law Unanimously Supports the Enforceability of Narrative Conditions in NPDES Permits .............................15

        3.     Fola Cannot Collaterally Attack the Validity of Its Narrative Condition in this CWA Enforcement Action ..........18

    C.     Fola's Permit Violations Are Not Protected by the CWA's Permit Shield ................................................................19

        1.     This Court Held in *Piney Run* that the Permit Shield Does Not Apply if the Permittee Violates Its Permit Conditions ........................................................................20

        2.     Fola Cannot Use Extrinsic Evidence About the State Permit Shield to Interpret or Enlarge the Federal Permit Shield..........................................................................23

    D.     Holding Fola Liable for Violating Its Narrative Permit Condition and Water Quality Standards Is Consistent with the CWA and Its Permitting Scheme .......................................28

i

E.    Even if Fola's Discharges Were Protected by the CWA's Permit Shield, Those Discharges Violate SMCRA ...........................32

1.    The Court Lacks Jurisdiction to Consider Fola's Untimely Collateral Attack on the SMCRA Standard.............33

2.    WVDEP's SMCRA Standard Is Consistent with the CWA ...............................................................................34

F.    The District Court Applied the Correct Method for Determining Whether West Virginia's Narrative Water Quality Standard Is Violated ................................................................38

G.    Fola Was Not Deprived of Fair Notice .................................43

II.    The District Court's Decision on Relief Should Be Affirmed .....................47

A.    Standard of Review ..........................................................47

B.    The District Court Properly Ordered Fola to Reduce Its Discharges of Conductivity into Stillhouse Branch to 300 µS/cm or Less .................................................................47

1.    The District Court's Order Is Reasonably Calculated to Remedy Fola's Permit Violation ...............................48

2.    The District Court's Order Targets Fola's Discharges of a Mixture of Chemical Ions that Are Actionable Discharges of Pollutants Under the CWA ................................50

3.    The District Court Did Not Have to Follow EPA's Permitting Rules for Indicator Parameters.................55

4.    The District Court's Order Is Consistent with SMCRA, Which Does Not Require Proof of a Discharge of CWA Pollutants...................................................................56

Conclusion .................................................................................56

Request for Oral Argument..........................................................58

Addendum of Regulations ...........................................................59

Certificate of Compliance with Rule 28.1(e) or 32(a) ............................61

ii

# Table of Authorities

**Page(s)**

**Cases**

*Alaska Community Action on Toxics v. Aurora Energy Servs., LLC*,
765 F.3d 1169 (9th Cir. 2014) ...........................................................22

*Altamaha Riverkeeper v. Rayonier*,
2015 WL 1505971 (S.D. Ga. 2015) ...................................................15

*Am. Canoe Ass'n v. Murphy Farms*,
412 F.3d 536 (4th Cir. 2005) .............................................................45

*Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*,
524 U.S. 214 (1998) ...........................................................................38

*Arkansas v. Oklahoma*,
503 U.S. 91 (1992) .............................................................................29

*Atlantic States Legal Foundation v. Eastman Kodak*,
12 F.3d 353 (2d Cir. 1993) ...........................................................17, 36

*Bldg. Indus. Ass'n of San Diego Cnty. v. State Water Res. Control Bd.*,
124 Cal. App. 4th 866 (2004) ............................................................31

*Bragg v. West Virginia Coal Ass'n*,
248 F.3d 275 (4th Cir. 2001) .............................................................39

*Brown v. Nucor Corp.*,
576 F.3d 149 (4th Cir. 2009) .............................................................47

*Citizens Coal Council v. EPA*,
447 F.3d 879 (6th Cir. 2006) .............................................................26

*Connecticut Fund for Env't v. Raymark Indus., Inc.*,
631 F. Supp. 1283 (D. Conn. 1986) ...................................................17

*Coon v. Willet Dairy, LP*,
536 F.3d 171,173 (2d Cir. 2008) .......................................................22

*Envtl. Quality Comm'n v. City of Coos Bay*,
171 Or. App. 106, 14 P.3d 649 (2000) ..............................................31

*EPA v. City of Green Forest*,
  921 F.2d 1394 (8th Cir. 1990) ..........................................................................46

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000)..........................................................................................38

*General Motors Corp. v. EPA*,
  168 F.3d 1377 (D.C. Cir. 1999)..................................................................18, 19

*Gill v. LDI*,
  19 F. Supp. 2d 1188 (W.D. Wash. 1998) ..........................................................17

*Hodel v. Virginia Surface Min. & Reclam. Ass'n*,
  452 U.S. 264 (1981)..........................................................................................39

*Humane Soc. of U.S. v. HVFG, LLC*,
  2010 WL 1837785 (S.D.N.Y. May 6, 2010) .....................................................17

*In Re Ketchikan Pulp Co.*,
  7 E.A.D. 605 (EPA 1998) .................................................................................24

*In re: Surface Mining Regulation Litigation*,
  627 F.2d 1346 (D.C. Cir. 1980).........................................................................34

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
  399 F.3d 248 (3d Cir. 2005) ..............................................................................49

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
  514 U.S. 52 (1995)............................................................................................29

*Mining Energy, Inc. v. Dir., Office of Workers' Comp. Programs*,
  391 F.3d 571 (4th Cir. 2004) .............................................................................26

*Molinary v. Powell Mountain Coal Co.*,
  125 F.3d 231 (4th Cir. 1997) .............................................................................32

*Morris v. U.S. Nuclear Regulatory Comm'n*,
  598 F.3d 677 (10th Cir. 2010) ...........................................................51, 53, 54

*Nat'l Fed'n of the Blind v. Lamone*,
  813 F.3d 494 (4th Cir. 2016) .............................................................................48

iv

*Natural Res. Def. Council v. County of Los Angeles*,
  725 F.3d 1194 (9th Cir. 2013) ......................................................16, 22

*Natural Res. Def. Council v. Metropolitan Water Reclamation District
  of Greater Chicago*,
  2016 WL 1588510 (N.D. Ill. Apr. 20, 2016)...................................14, 17, 21, 31

*Natural Res. Def. Council v. Sw. Marine, Inc.*,
  236 F.3d 985 (9th Cir. 2000) ............................................................49

*New Manchester Resort & Golf, LLC v. Douglasville Development, LLC*,
  734 F. Supp. 2d 1326 (N.D. Ga. 2010).........................................17, 31

*Northwest Envtl. Advocates v. City of Portland*,
  56 F.3d 979 (9th Cir. 1995) ............................................15, 16, 29, 31

*Oregon Nat. Res. Council v. U.S. Forest Service*,
  834 F.2d 842 (9th Cir. 1987) ............................................................17

*OVEC v. Elk Run Coal Co.*,
  2014 WL 29562 (S.D.W.Va. Jan. 3, 2014).......................................44

*OVEC v. Elk Run Coal Co.*,
  24 F. Supp. 3d 532, 556 (S.D.W.Va. 2014).....................40, 43, 44, 46

*OVEC v. Fola Coal Co.*,
  2013 WL 6709957 (S.D.W.Va. Dec. 19, 2013) ................................19

*OVEC v. Fola Coal Co.*,
  Civil No. 2:13-cv-21588, Doc. 94 (S.D.W.Va. May 29, 2015) ........15

*OVEC v. Fola Coal Co., LLC*,
  82 F. Supp. 3d 673 (S.D.W.Va. 2015)................................................2

*OVEC v. Marfork Coal Co.*,
  966 F. Supp. 2d 667 (S.D.W.Va. 2013)................................11-13, 17, 25-27, 30

*Parker v. Scrap Metal Processors, Inc.*,
  386 F.3d 993 (11th Cir. 2004) .....................................................36, 37

*PBM Products, LLC v. Mead Johnson & Co.*,
  639 F.3d 111 (4th Cir. 2011) ............................................................47

v

*Penn. Coal Mining Ass'n v. Watt*,
  562 F. Supp. 741 (M.D. Pa. 1983) ......................................................35

*Piney Run Preservation Preservation Ass'n v. County Commissioners*,
  268 F.3d 255 (4th Cir. 2001) ........................................... 11, 20-23, 25

*Public Interest Research Group v. Powell Duffryn Terminals*,
  913 F.2d 64 (3d Cir. 1990) ...............................................................19

*Ritter v. Cecil County Office of Housing*,
  33 F.3d 323 (4th Cir. 1994) ...............................................................27

*S. Appalachian Mountain Stewards v. A & G Coal Corp.*,
  758 F.3d 560 (4th Cir. 2014) ...............................................................22

*Sierra Club v. ICG Hazard, LLC*,
  781 F.3d 281 (6th Cir. 2015) .........................................................17, 38

*Sierra Club v. Simkins Industries, Inc.*,
  847 F.2d 1109 (4th Cir. 1988) ...............................................................18

*Sierra Club v. Young Life Campaign*,
  176 F. Supp. 2d 1070 (D. Colo. 2001) ...............................................46

*State of N. Y. v. U.S.*,
  620 F. Supp. 374 (E.D.N.Y. 1985) ...................................................17

*Swartz v. Beach*,
  229 F. Supp. 2d 1239 (D. Wyo. 2002) ...............................................17

*Three Lower Counties Cmty. Health Servs., Inc. v. Maryland*,
  498 F.3d 294 (4th Cir. 2007) ...............................................................42

*U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine, LLC.*,
  215 F. Supp. 2d 239 (D. Me. 2002) ...................................................46

*U.S. v. Akzo Coatings of Am., Inc.*,
  949 F.2d 1409 (6th Cir. 1991) ...............................................................44

*U.S. v. Hoechst Celanese Corp.*,
  128 F.3d 216 (4th Cir. 1997) .........................................................43, 44

*U.S. v. Locke,*
   529 U.S. 89 (2000) ............................................................................37

*U.S. v. Smithfield Foods,*
   191 F.3d 516 (4th Cir. 1999) ............................................31, 36, 46

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ........................................................................49

*Wisconsin Resources Protection Council v. Flambeau Mining Co.,*
   727 F.3d 700 (7th Cir. 2013) ..........................................................22

**Statutes**

28 U.S.C. § 1291 ....................................................................................2

28 U.S.C. § 1292(a) ......................................................................2, 9, 32

30 U.S.C. § 1251(a)(B) ........................................................................34

30 U.S.C. § 1255(b) ........................................................................35, 36

30 U.S.C. § 1270(a) ..........................................................................1, 47

30 U.S.C. § 1270(a)(1) ............................................................................1

30 U.S.C. § 1276(a)(1) ..........................................................................34

33 U.S.C. § 1311(b)(1)(C) ..............................................................35, 37

33 U.S.C. § 1313(c)(3) ..........................................................................39

33 U.S.C. § 1313(d) ..........................................................................5, 41

33 U.S.C. § 1342(k) ........................................................................20, 24

33 U.S.C. § 1362(11) ............................................................................26

33 U.S.C. § 1365(a) ..........................................................1, 18, 47, 49

33 U.S.C. § 1365(a)(1)(A) ................................................................1, 15

33 U.S.C § 1365(f) ................................................................................26

33 U.S.C. § 1365(f)(6) ....................................................................18, 29

vii

33 U.S.C. § 1370 ...........................................................................25, 31, 35

W.Va. Code § 22-11-6(2) .....................................................................24

W.Va. Code §§ 22B-1-7(b) & (c) .........................................................19

W.Va. Senate Bill 615 (2012)...............................................................26

**Regulations**

30 C.F.R. § 816.42 .........................................................................33, 35

38 C.S.R. § 2-14.5.b.....................................................1, 4, 13, 32, 35, 56

38 C.S.R. § 2-14.5.c.....................................................................32, 56

40 C.F.R. Part 122 ................................................................................55

40 C.F.R. Part 122, App. D, Table IV ..................................................51

40 C.F.R. § 122.1(a) .............................................................................55

40 C.F.R. § 123.45, App. A ..................................................................51

40 C.F.R. § 123.62(b) ...........................................................................27

40 C.F.R. § 130.7 ..................................................................................40

40 C.F.R. § 131.3(b) .......................................................................29, 55

40 C.F.R. § 131.11(b) .............................................................................4

40 C.F.R. § 131.21 ................................................................................39

40 C.F.R. § 401.16 ................................................................................51

44 Fed. Reg. 14902 (Mar. 13, 1979).....................................................36

47 C.S.R. Part 30 ....................................................................................3

47 C.S.R. § 2-3.2.e & i................................................................40, 44, 50

47 C.S.R. § 30-5.1 .................................................................................12

47 C.S.R. § 30-5.1.a................................................................................3

47 C.S.R. § 30-5.1.f ....................................................................... 1, 3, 11-13, 26, 27

47 C.S.R. §§ 30-5.1 to 30-5.19 ................................................................30

47 Fed. Reg. 20119 (May 18, 1982) .......................................................34

47 Fed. Reg. 39821 (Sept. 10, 1982) ......................................................34

47 Fed. Reg. 47216 (Oct. 22, 1982) .......................................................33

74 Fed. Reg. 62996 (Dec. 1, 2009) .........................................................26

**Other Authorities**

EPA NPDES Permit Writers' Manual (2010) ......................................4, 5

S. Rep. No. 414, 92nd Cong., 2nd Sess. (1972), reprinted in 1972
    U.S.C.C.A.N. 3668 ...........................................................................29

## Jurisdictional Statement

The district court had jurisdiction over the complaint of Appellees Ohio Valley Environmental Coalition, et al. ("OVEC") under the citizen suit provisions of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a), and the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1270(a). The CWA authorizes citizens to enforce "an effluent standard or limitation," which Congress defined to mean "a permit or condition thereof." 33 U.S.C. §§ 1365(a)(1)(A), (f)(6). OVEC is enforcing the narrative condition in a West Virginia National Pollutant Discharge Elimination System ("WV/NPDES") permit issued under the CWA by the West Virginia Department of Environmental Protection (WVDEP) to Appellant Fola Coal Company, LLC ("Fola"). That condition prohibits Fola from discharging pollutants that cause a violation of state water quality standards. JA 1257, incorporating by reference 47 W.Va. Code of State Rules ("C.S.R.") § 30-5.1.f., Addendum at 59. SMCRA authorizes citizens to enforce "any rule, regulation . . . or permit issued pursuant" to SMCRA. 30 U.S.C. § 1270(a)(1). OVEC is enforcing a rule issued by WVDEP under its federally-approved state SMCRA program that prohibits Fola from discharging mine water that causes a violation of water quality standards. 38 C.S.R. § 2-14.5.b., Addendum at 60. Thus, both the CWA and SMCRA authorize OVEC to enforce Fola's violations of

water quality standards.

After a bench trial, the district court found on January 27, 2015 that Fola has violated its CWA and SMCRA permits by discharging pollutants and mine water that have caused a violation of West Virginia's water quality standard for biological integrity in Stillhouse Branch. JA 571; *OVEC v. Fola Coal Co., LLC*, 82 F. Supp. 3d 673 (S.D.W.Va. 2015). After a second bench trial on relief, the district court issued a final order specifying relief on December 8, 2015. That order imposed an injunction requiring Fola to take remedial measures to comply with its permits and appointed a Special Master to supervise those measures. JA 1225-36. On January 7, 2016, Fola appealed from that order. JA 1237. On January 21, 2016, OVEC cross-appealed, but later dismissed that cross-appeal. JA 1239. This Court has jurisdiction under 28 U.S.C. § 1291 from the district court's final orders on liability and relief, and under 28 U.S.C. § 1292(a) from the district court's decision granting an injunction.

## Statement of Issues Presented for Review

1.     Whether the narrative condition in Fola's CWA permit that requires compliance with water quality standards is enforceable;

2.     Whether Fola is ineligible for the CWA permit shield because it is in violation of that narrative permit condition;

2

3.      Whether, even if the CWA permit shield did apply, Fola is in violation of the

SMCRA performance standard that also requires compliance with water quality

standards;

4.      Whether the district court correctly used the same method that the U.S.

Environmental Protection Agency has used to determine whether Fola is violating

its narrative permit condition and West Virginia's narrative water quality standard;

5.      Whether Fola's narrative permit condition is sufficiently specific to provide

fair notice of the proscribed conduct;

6.      Whether the district court, in issuing an injunction, properly ordered Fola to

reduce its discharges of conductivity into Stillhouse Branch.

## Counter-Statement of the Case

Fola's Surface Mine No. 3 discharges from Outlet 029 into Stillhouse

Branch, a tributary of Twentymile Creek.  JA 709-10.  Section C of Fola's

WV/NPDES permit incorporates by reference nineteen listed sections of

WVDEP's NPDES regulations for coal mines at 47 C.S.R. Part 30.  JA 1257.  The

first listed section in those regulations is "5.1. Duty to Comply, Penalties."  *Id.*

The first sentence of § 5.1.a states that "[t]he permittee must comply with all

conditions of a WV/NPDES permit."  47 C.S.R. § 30-5.1.a, Addendum at 60.  The

first sentence of § 5.1.f states that " the discharge or discharges covered by a

3

WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [47 C.S.R. § 2]."  *Id.*, § 5.1.f., Addendum at 59.

Fola's mine is also subject to regulation under SMCRA.  West Virginia's federally-approved SMCRA program requires mine operators to obtain mining permits and to comply with those permits and applicable performance standards. JA 573, *citing* 38 C.S.R. § 2-3.33.c.  Those standards provide that mining discharges "shall not . . . cause a violation of applicable water quality standards" and permittees shall install "adequate facilities . . . to treat any water discharged from the permit area so that it complies with" that requirement.  38 C.S.R. §§ 2-14.5.b. & c., Addendum at 60.  Fola has a SMCRA permit for its Surface Mine No. 3 that is subject to these standards.  JA 710.

EPA regulations provide that states should adopt both numerical and narrative water quality criteria.  40 C.F.R. § 131.11(b).  Where "numerical criteria cannot be established or to supplement numerical criteria," states should "[e]stablish narrative criteria or criteria based upon biomonitoring methods."  *Id.*, § 131.11(b)(2).  "All states have adopted narrative water quality criteria to supplement numeric criteria."  EPA NPDES Permit Writers' Manual at 6-8 (2010), available at https://www.epa.gov/npdes/npdes-permit-writers-manual.  "Narrative

4

criteria are statements that describe the desired water quality goal for a waterbody." *Id.*

West Virginia has established narrative water quality criteria that prohibit the discharge of wastes from surface mining operations that "cause . . . or materially contribute to" 1) "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life" or 2) "[a]ny other condition . . . which adversely alters the integrity of the waters of the State." JA 573, citing 47 C.S.R. § 2-3.2.e, 3.2.i. Additionally, "no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed." *Id.*, citing 47 C.S.R. § 2-3.2.i.

Biological changes in streams are measured and reflected in the West Virginia Stream Condition Index ("WVSCI") score. The WVSCI is a multi-metric index that is used to measure stream health. JA 407-09. It is the biomonitoring method used by WVDEP to determine whether a stream is biologically impaired. JA 649-50; *see* EPA NPDES Permit Writers' Manual at 6-12. When the WVSCI score falls below 68, the U.S. Environmental Protection Agency ("EPA") has determined that the stream is biologically impaired, violates West Virginia's narrative water quality standard for biological integrity, and must be listed under § 303(d) of the CWA, 33 U.S.C. § 1313(d), as an impaired water. JA 573-74, 589,

648-52.

Fola blasted the rock overlaying the coal at its Surface Mine No. 3 and dumped that rock into a valley fill that covers more than 90 percent of Stillhouse Branch.  JA 442.  Water flowing through pyrite in that rock pile forms sulfuric acid which dissolves the blasted rock and releases large amounts of calcium, bicarbonate and sulfate, forming a strong ionic soup of alkaline mine drainage with high levels of conductivity.  JA 409-11, 673.  As a result, the post-mining levels of conductivity in the waters downstream from Fola's mine increased by a factor of thirty or more compared to pre-mining levels, from 47-104 microsiemens per centimeter ($\mu$S/cm) in 1994-95 to over 3000 $\mu$S/cm in 2011.  JA 710-14.  Sensitive aquatic insects in the streams that evolved and acclimated to low conductivity could not withstand this drastic change and disappeared from the stream.  JA 411-12, 445, 548-49.  Insects tolerant to high conductivity proliferated.  JA 447.  As the district court stated, "[l]osing diversity in aquatic life, as sensitive species are extirpated and only pollution-tolerant species survive, is akin to the canary in a coal mine."  JA 612.

As conductivity increases, the WVSCI score declines.  JA 419.  All of the WVSCI scores since 2003 in Stillhouse Branch downstream from Fola's mine have been below 68, and have ranged from 31.6 to 58.17.  JA 607, 702, 712-13.  As a

6

result of these failing WVSCI scores, in 2008 and prior to the issuance of Fola's

2009 WV/NPDES permit, WVDEP listed Stillhouse Branch as biologically

impaired and identified ionic toxicity as the significant stressor.  JA 607, 693, 699,

712.  WVDEP continued to report Stillhouse Branch as biologically impaired in its

2012 List of impaired streams under Section 303(d) of the CWA and identified

"mining" as the source of the impairment.  JA 607, 1014.  Fola's mine is the only

mine that discharges into that stream.  JA 710.

　　　　After a bench trial on liability issues, the district court found that Fola is

violating its CWA and SMCRA permits by discharging pollutants and mine water

that are causing at least one violation of West Virginia's water quality standard for

biological integrity in Stillhouse Branch.  JA 571.  On appeal, Fola does not

challenge the district court's finding of a causal link between its discharges and

biological impairment in Stillhouse Branch.  After a subsequent bench trial on

relief issues, the district court found that "injunctive relief is appropriate and

necessary to remedy Defendant's violations."  JA 1024.  The district court found

that all four equitable factors supported issuance of an injunction "requiring

Defendant to comply with water quality standards."  JA 1030.  The district court

found that such compliance requires "measures as are necessary to reduce the level

of conductivity in Stillhouse Branch to 300 microsiemens per centimeter (300

7

µS/cm) or less or to achieve passing WVSCI scores" in that stream.  JA 1225.

## Summary of Argument

The Clean Water Act authorizes citizens to enforce all conditions in NPDES permits, including narrative conditions.  A narrative condition in Fola's CWA permit and a SMCRA rule unambiguously require Fola's discharges to comply with water quality standards.  The permit language is sufficient to provide fair notice of what conduct is proscribed.  Every federal court to consider the issue has agreed that such a narrative condition is enforceable.  Fola does not challenge the district court's finding that its mine drainage is causing violations of water quality standards in Stillhouse Branch.  Instead, it is seeking an interpretation that would give it legal immunity for those violations.

Fola's interpretation is in direct conflict with the plain language of the CWA, SMCRA, and its permits.  It is seeking an unprecedented judicially-created exemption from the statutory language that authorizes enforcement of NPDES permit conditions and SMCRA rules.  It is also waging an impermissible collateral attack on the validity of its narrative permit condition and the SMCRA rule.  Fola cannot mount such an attack on its own permit condition or the underlying rule because it never filed a timely appeal in the proper court to challenge either that condition or that rule.

8

Fola's reliance on the CWA's permit shield is misplaced, because that shield only applies if a discharger is in compliance with its permit, and Fola is not in compliance. Fola's extrinsic evidence about West Virginia's interpretation of its state permit shield is immaterial, because the scope of the federal permit shield is controlling, EPA interprets that shield to require compliance with all permit conditions, and West Virginia's less stringent interpretation of the federal shield is pre-empted.

In any event, even if the CWA permit shield did apply, Fola's SMCRA permit provides an alternative basis for liability, because it also requires compliance with water quality standards. SMCRA's savings clause does not change that result, because that clause only displaces SMCRA standards that are inconsistent with the CWA. 30 U.S.C. § 1292(a). SMCRA and the CWA are consistent. Both require compliance with water quality standards. A savings clause cannot be used to destroy a central objective of both statutes.

In reaching its decision on liability, the district court did not "usurp" West Virginia's role and develop a "court-ordered water quality standard." Fola Br. 49-50. Instead, the district court made a case-specific adjudicatory determination about whether Fola has violated its permits. In doing so, it applied the WVDEP's long-standing interpretation that when the measured WVSCI score falls below 68,

9

the stream is impaired and therefore discharges contributing to that impairment violate water quality standards. EPA, which has the final authority as a matter of federal law to interpret the CWA, confirmed in 2013 that a score of 68 is the proper threshold for determining impairment. The district court applied the same WVSCI method and impairment threshold in this case that EPA has used to evaluate impairment. The WVSCI scores in Stillhouse Branch are all below 68 and therefore demonstrate impairment. Fola is therefore liable under both the CWA and SMCRA for violating its permits.

In granting relief, the district court properly ordered Fola to reduce the conductivity in its discharges to Stillhouse Branch to 300 µS/cm or less. Although conductivity is an indicator rather than a pollutant, Fola discharged an identifiable mixture of ionic pollutants in its alkaline mine drainage that are measured as conductivity and that are known to cause biological impairment. Based on the evidence presented at trial, the district found the level of stream conductivity needed to be 300 µS/cm or less in order to correct Fola's permit violation and restore the stream's biological integrity. The district court had the equitable power to impose that affirmative obligation because it is reasonably calculated to remedy Fola's statutory violation.

10

**Argument**

**I.    The District Court's Decision on Fola's Liability Should Be Affirmed**

**A.    Standard of Review**

This Court reviews the district court's interpretation of Fola's permits "in the same manner as we would contracts or other legal documents." *Piney Run Preservation Preservation Ass'n v. County Commissioners*, 268 F.3d 255, 269 (4th Cir. 2001). "We review the district court's application of contract principles *de novo*, but review its findings of fact with respect to extrinsic matters for clear error." *Id.*

**B.    The Narrative Condition in Fola's CWA Permit Is Enforceable**

**1.    The Narrative Condition Must Be Read to Prohibit Fola From Causing a Violation of Water Quality Standards**

Fola's permit incorporates by reference 47 C.S.R. § 30-5.1.f, a WV/NPDES rule which the district court found unambiguously prohibits Fola from discharging pollutants that cause a violation of water quality standards. JA 572, 1257; Addendum at 59; *OVEC v. Marfork Coal Co.,* 966 F. Supp. 2d 667, 682-83 (S.D.W.Va. 2013). Fola challenges this conclusion, arguing that Rule 5.1.f. "does not expressly command a permit holder to meet water quality standards," and instead it merely requires WVDEP to "craft permits that ensure that discharges meet water quality standards." Fola Br. 30-31. Fola also argues that because Rule

11

5.1.f is stated in the passive voice, it creates no enforceable duty on the permit holder and merely describes how the NPDES permit operates. *Id.* at 34.

This interpretation is entirely Fola's own invention. Fola points to no evidence that WVDEP, the permit-writer, supports it. In fact, one of WVDEP's own enforcement actions contradicts Fola's interpretation. WVDEP entered into a consent decree enforcing a mining company's violation of the water quality standard for selenium, where the permit lacked a specific effluent limit for selenium but included the same narrative provision incorporating Rule 5.1.f and requiring compliance with water quality standards. *Marfork,* 966 F. Supp. 2d at 681 n. 7. WVDEP therefore must have believed that Rule 5.1.f applies to the permittee, not to WVDEP.

In addition, Fola's interpretation of Rule 5.1.f. is not supported by the language or structure of its permit or the rule itself. As shown in the Addendum to this brief, the title of Rule 5.1 is "Duty to Comply; Penalties." Addendum at 59. That same title is repeated in Fola's permit. JA 1257. The first sentence of that rule states that "[t]he permittee must comply with all conditions of a WV/NPDES permit" and the next sentence states that permit noncompliance "is grounds for enforcement action." *Id.* That leaves no doubt that Rule 5.1 as a whole applies to and is enforceable against the permittee, not WVDEP. The subsection at issue

12

here—Rule 5.1.f—is part of that same rule and therefore must be construed to apply to the permittee. That Rule's use of the passive voice does not change this conclusion, because "discharges covered by a WV/NPDES permit" are the subject of its command, and those discharges are the permittee's responsibility.[1]

Fola argues that this interpretation makes the numerical effluent limits in its permit superfluous and meaningless. Fola Br. 32. It does not. As the district court found, the narrative condition serves two important functions. First, it makes NPDES permits for coal mines consistent with the SMCRA permits for those mines. West Virginia's SMCRA program contains a performance standard that mining discharges "shall not violate effluent limitations or cause a violation of water quality standards." 38 C.S.R. § 2-14-5.b. "This performance standard explains why the quality standard is specifically included in NPDES permits for coal facilities and not those for other industries." *Marfork,* 966 F. Supp. 2d at 684.

Second, the narrative condition "has the effect of protecting water quality standards even regarding pollutants for which WVDEP did not establish specific

---

[1] The other Rules that Fola identifies as also employing the passive voice (Fola Br. 33-34) confirm this reading, because they pertain not to events that occurred solely in the past when the permit was drafted, but to ongoing features or requirements of the permit. Amici argue that this phrase does not identify which discharges are covered (Amici Br. 11), but the first page of Fola's WV/NPDES permit states that it covers the "discharge [of] treated water and storm water" into several listed streams, including Stillhouse Branch. JA 1243.

13

permit effluent limitations." *Id.* at 684-85. The provision acts as a "backstop," because it "protects water quality standards that WVDEP did not anticipate would be threatened based on the discharge levels reported in a permit application." *Id. See also Natural Res. Def. Council v. Metropolitan Water Reclamation District of Greater Chicago ("Metropolitan"),* 2016 WL 1588510, at *8 (N.D. Ill. Apr. 20, 2016) (interpreting similar language to "impose an outer limit to the extent that the [permittee] must ensure that its effluent does not cause certain conditions in the receiving waters").

Fola argues that the district court's interpretation is inconsistent with the permit modification provision that allows WVDEP to modify the effluent limits to comply with water quality standards. Fola Br. 32-33. There is no inconsistency. Permit modification is a permissive, but not the exclusive, method to ensure compliance with those standards. As the district court concluded in a similar case, "[i]t is perfectly sensible for WVDEP to at once reserve authority to modify specific effluent limits as necessary to ensure future compliance with water quality standards and also to require that permittees nevertheless meet water quality standards in the event that specific permit terms are otherwise inadequate."[2]

---

[2] The case cited by Fola on this point is distinguishable. In that case, the permit provision required compliance with water quality standards, and the issue was how broadly to read that requirement. The court held that the context and

14

*OVEC v. Fola Coal Co.,* Civil No. 2:13-cv-21588, Doc. 94 at 24 (S.D.W.Va., May 29, 2015).

### 2.    The Case Law Unanimously Supports the Enforceability of Narrative Conditions in NPDES Permits

The CWA authorizes citizens to enforce "an effluent standard or limitation," which Congress defined to mean "a permit or condition thereof." 33 U.S.C. §§ 1365(a)(1)(A), (f)(6). Congress did not limit citizen enforcement to numerical conditions in permits. The case law is unanimous. Every court to consider the issue, including this Court, has ruled that citizens can enforce compliance with narrative conditions in NPDES permits, including conditions prohibiting discharges that violate water quality standards.

The seminal case on that issue is *Northwest Envtl. Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995) ("*NWEA*"), which has not been questioned by any other court for twenty years. In *NWEA,* the plaintiffs brought a CWA suit to enforce an NPDES permit condition which "prohibit[ed] any discharges that would violate Oregon water quality standards." *Id*. at 985. The Ninth Circuit rejected the argument that "§ 505 allows citizens to enforce only those water

---

structure of that particular provision demonstrated that the permittee was only required to comply with the water quality standards related to biomonitoring and toxicity reduction, not all such standards. *Altamaha Riverkeeper v. Rayonier,* 2015 WL 1505971, at *9 (S.D. Ga. 2015). Fola's permit condition is broader and covers all standards.

15

quality standards that are translated into effluent limitations." *Id.* at 986. The court of appeals held that the narrative permit condition requiring compliance with water quality standards was enforceable. *Id.* at 990.

The Ninth Circuit relied on the Supreme Court's decision in *PUD No. 1 of Jefferson County v. Washington Department of Ecology*, 511U.S. 700 (1994). 56 F.3d at 987. In that case, the Court held that the CWA allows States to enforce the broad narrative criteria contained in water quality standards. 511 U.S. at 715-16. The Court rejected the argument that numerical criteria were required for enforcement and held that the state could enforce its qualitative requirement that stream flow be sufficient to allow particular uses. *Id.* at 716-17.

The Ninth Circuit recently reaffirmed the continuing vitality of its *NWEA* decision. In *Natural Res. Def. Council v. County of Los Angeles*, 725 F.3d 1194 (9th Cir. 2013), the court of appeals stated that "a permittee violates the CWA when it discharges pollutants in excess of the levels specified in the permit, or where the permittee otherwise violates the permit's terms." *Id.* at 1204. The permit condition enforced by the court in that case, like the one here, prohibited "discharges . . . that cause or contribute to the violation of the Water Quality Standards or water quality objectives." *Id.* at 1199.

Every other court to consider the enforceability of such a condition has

16

agreed.[3]  Fola and amici do not cite a single case holding that narrative permit

conditions in NPDES permits are meaningless boilerplate and are unenforceable.

None of the cases that Fola cites involved the enforceability of narrative permit

conditions that incorporated water quality standards by reference.[4]  Fola Br. 41.

When those conditions exist, water quality standards "are no less binding when

they are in the form of narrative or qualitative criteria instead of numeric

limitations."  *Metropolitan,* 2016 WL 1588510 at *7.

---

[3] *Metropolitan,* 2016 WL 1588510, at *5-*8 (enforcing permit condition
prohibiting violations of water quality standards); *Marfork*, 966 F. Supp. 2d at 685
(same); *New Manchester Resort & Golf, LLC v. Douglasville Development, LLC*,
734 F. Supp. 2d 1326, 1336-39 (N.D. Ga. 2010) (same); *Gill v. LDI*, 19 F. Supp.
2d 1188, 1194-95 (W.D. Wash. 1998) (same); *Humane Soc. of U.S. v. HVFG, LLC*,
2010 WL 1837785, at *11 (S.D.N.Y. May 6, 2010) (permittee "is obligated to
comply with all aspects of its permits, not merely the discharge limits or
prohibitions, and may suffer liability under the Clean Water Act if it fails to do
so"); *Swartz v. Beach*, 229 F. Supp. 2d 1239, 1271 (D. Wyo. 2002) ("when state
standards are incorporated into a NPDES permit . . . those standards are
enforceable in a citizen suit under the CWA"); *Connecticut Fund for Env't v.
Raymark Indus., Inc.*, 631 F. Supp. 1283, 1285 (D. Conn. 1986) ("[t]here is
nothing in the language or legislative history of the Act to suggest that a citizens'
suit may seek to enforce only those conditions of an NPDES permit that regulate
the quality of a discharge immediately before its release into navigable waters").

[4] Those cases instruct that, in the absence of a narrative permit condition,
water quality standards are not directly enforceable under the CWA.  *Atlantic
States Legal Foundation v. Eastman Kodak,* 12 F.3d 353, 357-59 (2d Cir. 1993);
*Oregon Nat. Res. Council v. U.S. Forest Service*, 834 F.2d 842, 850 (9th Cir.
1987); *State of N. Y. v. U.S.*, 620 F. Supp. 374, 382-84 (E.D.N.Y. 1985); *Sierra
Club v. ICG Hazard, LLC*, 781 F.3d 281, 290-91 (6th Cir. 2015).  They do not
address the issue in this case.

17

Furthermore, while this Court has not yet directly addressed the enforceability of a narrative permit condition that requires compliance with water quality standards, it has allowed citizens to enforce a similar narrative permit condition under the CWA. In *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1115 (4th Cir. 1988), this Court held that "Simkins' reporting requirements are expressly made conditions of its permit, and therefore violations of these conditions, by operation of § 1365(f)(6), are violations of an effluent standard or limitation of § 1365(a)." Those reporting requirements are narrative conditions, not numerical effluent limits. From a statutory standpoint, there is no difference between a narrative reporting condition and a narrative water quality condition. The statute authorizes enforcement of "a permit or condition thereof," and that means all permit conditions. 33 U.S.C. § 1365(f)(6).

### 3.    Fola Cannot Collaterally Attack the Validity of Its Narrative Condition in this CWA Enforcement Action

Fola challenges the enforceability of its narrative condition under a variety of theories, which are all essentially collateral attacks on the validity of that condition. It is well-settled that a CWA permittee cannot challenge the validity of its state-issued NPDES permit in an enforcement proceeding. In *General Motors Corp. v. EPA*, 168 F.3d 1377, 1380 (D.C. Cir. 1999), the D.C. Circuit rejected the argument that "state law governs which defenses a permittee may raise in the

18

course of a federal proceeding to enforce the terms of a state-issued permit."
Instead, those defenses are governed by federal law, and federal law does not allow
a collateral attack on a state-issued NPDES permit in a federal enforcement
proceeding. *Id*. at 1383. Similarly, in *Public Interest Research Group v. Powell
Duffryn Terminals*, 913 F.2d 64, 78 (3d Cir. 1990), the Third Circuit held that
because the permittee "never challenged the BOD and TSS limits in its permit until
[citizen plaintiffs] brought this enforcement action, it may not challenge them
now." "By failing to challenge a permit in an agency proceeding, [defendant] has
lost 'forever the right to do so, even though that action might eventually result in
the imposition of severe civil or criminal penalties.'" *Id*.

Fola could have brought a state administrative appeal within 30 days of the
issuance of its 2009 permit. W.Va. Code §§ 22B-1-7(b) & (c). It could thereafter
have sought judicial review in state court. *Id., § 22B-1-9(a).* Fola could also have
sought judicial review of the underlying state NPDES rule within one year after its
promulgation. *Id.* § 29A-4-2(a); *see OVEC v. Fola Coal Co.,* 2013 WL 6709957
(S.D.W.Va. Dec. 19, 2013), at *12-13. By failing to do so, Fola lost the right to
challenge its narrative condition and cannot collaterally attack that condition here.

### C.   Fola's Permit Violations Are Not Protected by the CWA's Permit Shield

Fola argues that if its discharges are in compliance with the numerical

19

effluent limits in its permit, Fola is protected by the permit shield in Section 402(k) of the CWA. Fola Br. 34-43; 33 U.S.C. § 1342(k). That result is not supported by the CWA, this Court's decision in *Piney Run* interpreting the permit shield, or the extrinsic evidence relied upon by Fola.

### 1. This Court Held in *Piney Run* that the Permit Shield Does Not Apply if the Permittee Violates Its Permit Conditions

Fola admits that "this case is controlled largely by this Court's decision in *Piney Run*," but ignores the factual differences between that case and the present case that foreclose application of the permit shield here. Fola Br. 28. In particular, Fola ignores the portion of the *Piney Run* decision holding that the permit shield is only available to a permittee who is in full compliance with the terms of its permit.

In *Piney Run*, the citizen plaintiffs claimed that the permittee was illegally discharging heat without a CWA permit, because the permit did not contain an effluent limit on heat. This Court held that the permit shield applied because the permittee had disclosed its discharges of heat in its permit application, the state had considered the issue, and the state's decision not to include a heat limit was within the protection of the permit shield. 268 F.3d at 271-72. Relying on *Piney Run*, Fola and amici argue that Fola's discharges of sulfate and conductivity are protected by the permit shield because Fola disclosed them during the permitting process. Fola Br. 27; Amici Br. 9-10.

20

The facts in this case are different from those in *Piney Run* and lead to a different result.  OVEC has not claimed that Fola has discharged pollutants without a permit.  Instead, OVEC has claimed and proven that Fola has violated a narrative permit condition by discharging ionic chemicals, measured as conductivity, that have caused violations of water quality standards.  The permit in *Piney Run* did not contain such a narrative condition, and there was no finding that the permittee in that case had violated its permit.

This Court held in *Piney Run* that "[a]n NPDES permit holder is shielded from liability for discharges in compliance with its permit, and is liable for any discharges not in compliance with its permit."  268 F.3d at 269.  A NPDES permit only shields "its holder from liability under the Clean Water Act as long as . . . the permit holder complies with the express terms of its permit."  *Id*. at 259.  Thus, under *Piney Run,* a permittee is liable for all discharges that are not in compliance with its permit.  Here, Fola is not in compliance with its narrative permit condition. *Piney Run* therefore instructs that Fola is not protected by a permit shield.

Fola's contrary argument, in essence, is that "disclosure + issuance of permit = immunity."  *Metropolitan,* 2016 WL 1588510 at *6.  But more is required. *Piney Run* holds that a permittee's discharges violate its permit "if *either* (1) the permit specifically barred such discharges; *or* (2) the [permittee] did not

21

adequately disclose them to" the permitting authority. 268 F.3d at 269 (emphasis added). Fola fails the first prong of this test, and therefore is liable for its permit violations. Full disclosure alone, without full permit compliance, is not enough to invoke the shield.

Cases subsequent to *Piney Run* support this conclusion . *See S. Appalachian Mountain Stewards v. A & G Coal Corp.*, 758 F.3d 560, 564 (4th Cir. 2014) (permit shield requires full compliance "with the conditions of the permit"). In *NRDC v. County of Los Angeles*, the citizen plaintiff claimed that the permittee was violating a narrative condition requiring compliance with water quality standards. The Ninth Circuit held that the permittee was not protected by the permit shield if it violated either the numerical effluent limits or other permit terms, including the narrative condition. 725 F.3d at 1204. *See also Alaska Community Action on Toxics v. Aurora Energy Servs., LLC,* 765 F.3d 1169, 1171 (9th Cir. 2014) ("If a discharger is covered by a NPDES permit and complies with that permit, the permit 'shields' it from liability under the CWA"); *Wisconsin Resources Protection Council v. Flambeau Mining Co.*, 727 F.3d 700, 706 (7th Cir. 2013) (quoting *Piney Run's* statement that "if a [NPDES] permit holder discharges pollutants precisely in accordance with the terms of its permit, the permit will 'shield' its holder from CWA liability"); *Coon v. Willet Dairy, LP*, 536

22

F.3d 171,173 (2d Cir. 2008) ("[C]ompliance with an authorized permit is deemed compliance with CWA, so as long as Willet Dairy was acting in accordance with its permit it could not be liable in a citizen suit for CWA violations.").  Thus, the permit shield insulates permittees who comply; it does not provide a license to permittees who violate.

### 2.    Fola Cannot Use Extrinsic Evidence About the State Permit Shield to Interpret or Enlarge the Federal Permit Shield

Fola argues that, under *Piney Run,* the scope of the permit shield defense is defined by using "extrinsic evidence to determine the intent of the permitting authority," including informal WVDEP letters, state legislative clarifications, and the contemplation of the parties.  Fola Br. 35, 40-41, quoting 268 F.3d 270, 271. That is mistaken.  This Court used extrinsic evidence in that case to "to determine the correct understanding of the *permit*," because the meaning of the permit provision that the plaintiff sought to enforce was ambiguous.  *Id.* (emphasis added).  This Court did not, however, use extrinsic evidence to interpret the statutory and regulatory language that determines the scope of the permit shield. Here, Fola's permit condition is not ambiguous, so resort to extrinsic aids is not required.

To define the scope of the permit shield under the CWA, this Court performed the standard two-part *Chevron* analysis.  *Id.* at 266-67.  In applying the

23

first part of that analysis, the Court found that the language in 33 U.S.C. § 1342(k) was ambiguous. *Id.* at 267. In applying the second part of that analysis, the Court considered the agency's statutory interpretation only if "the agency has promulgated that interpretation pursuant to a notice-and-comment rulemaking or a formal adjudication." *Id.* at 267. Only EPA's interpretation in its formal adjudication in *In Re Ketchikan Pulp Co.,* 7 E.A.D. 605 (EPA 1998), met that standard. *Id.* In *Ketchikan,* EPA stated that "section 402(k) shields a discharger from liability under the CWA *so long as it discharges in compliance with its permit.*" 7 E.A.D. at 617 (emphasis added). Based on that EPA interpretation, this Court decided that the shield applies only if the permittee is in compliance with all of the conditions in its permit and disclosed the full nature of its discharges in its permit application. 268 F.3d at 259, 269.

Fola does not cite any alternative EPA interpretation that supports its position on the scope of the permit shield. Instead, it relies on a hodge-podge of informal WVDEP letters and state legislative "clarifications." Those state sources all suffer from three defects.

First, they are based on an interpretation of state, not federal, law. West Virginia's permit shield statute, like the federal statute, requires "compliance with a permit." W.Va. Code § 22-11-6(2). A state's NPDES program cannot be less

24

stringent than federal law.  The CWA pre-empts "less stringent" state statutes.  33 U.S.C. § 1370.  If WVDEP's interpretation or the state legislature's "clarifications" of state law were correct, and the state statute shielded a permittee from liability when it was only "meeting the express numeric limits in a permit" (Fola Br. 37), but was not in full "compliance with a permit," then state law would be less stringent than the CWA and would be pre-empted.

Second, WVDEP's interpretations of the permit shield in informal letters do not have the requisite formality to receive deference under *Chevron*, because they were not made in an adjudication or a rule-making.  *Piney Run,* 268 F.3d at 267. Furthermore, as the district court explained in detail, those letters are contradictory and unreasonable.  *Marfork,* 966 F. Supp. 2d at 679-81.  WVDEP says in one letter that "West Virginia's permit shield is entirely co-extensive with federal law" and "mirrors" the federal permit shield.  JA 70.  WVDEP says in other letters that state law "shield[s] permittees who are meeting effluent limits" and that WVDEP cannot take enforcement action against a permittee who complies with those limits, even if the permittee violates a narrative condition in its permit requiring compliance with water quality standards.  JA 84; June 5, 2012 WVDEP Letter, quoted in *Marfork,*

25

966 F. Supp. 2d at 680.[5]  Contradictory agency interpretations receive no

deference.  *Mining Energy, Inc. v. Dir., Office of Workers' Comp. Programs*, 391

F.3d 571, 574 n. 1 (4th Cir. 2004).

The state legislative clarifications in Senate Bill 615 and WVDEP's rule

implementing that bill may have the requisite formality to warrant consideration,

but they nevertheless fail to support Fola's position because they both retain the

prior language requiring "compliance with a permit," which EPA and this Court

have interpreted to mean compliance with all permit conditions.  Senate Bill 615

(2012), JA 67; 47 C.S.R. § 30-5.1.f, XXX W.Va. Register 774 (May 10, 2013);

*Marfork*, 966 F. Supp. 2d at 677-80.  Consequently, as a matter of statutory

construction, the scope of the permit shield under federal and state law is co-

extensive.  *Id.* at 681.

---

[5] Fola contends that the district court misunderstood the state's interpretation by using the definition of "effluent limitation" in 33 U.S.C § 1365(f) instead of 33 U.S.C. § 1362(11) as the basis for determining the scope of the state permit shield. Fola Br. 39 n. 9.  However, even if the latter definition is used, EPA has defined that term to include non-numerical effluent limitations.  74 Fed. Reg. 62996, 63003 (Dec. 1, 2009).  *See Citizens Coal Council v. EPA,* 447 F.3d 879, 895 (6th Cir. 2006) ("under the Act, effluent limitations are not limited to numeric discharges but encompass 'any restriction' on discharges").  As a result, even if the state statute were interpreted to only require compliance with "effluent limits," Fola's narrative condition would still be an enforceable "restriction" on pollutants in its discharges within the meaning of that federal definition, and Fola would not be shielded from liability.

WVDEP's interpretation that "compliance with a permit" means "compliance with less than the full permit" would destroy that co-extensiveness and is inconsistent with the plain language of the state statute and its own regulation. When a state agency is interpreting regulations under the authority of a federally created program, deference "applies only to the extent the agency's rules are not contrary to the statute or regulation, and that question is one of law for the courts to determine *de novo*." *Ritter v. Cecil County Office of Housing*, 33 F.3d 323, 327-28 (4th Cir. 1994). WVDEP's interpretation fails that test and therefore is not entitled to any deference.

Third, if WVDEP or the state legislature's actions had the effect of expanding the state permit shield or eliminating Rule 5.1.f, those actions would constitute a revision to West Virginia's approved NPDES program. Revisions to State NPDES programs are not effective unless and until they are approved by EPA. JA 75, 81-82; 40 C.F.R. § 123.62(b); *Marfork*, 966 F. Supp. 2d at 681 n. 8. Fola admits that EPA has not approved such a modification. Fola Br. 40 n. 10. This Court cannot rely on actions by the West Virginia legislature that are not in effect – and may never be in effect – to interpret aspects of the program currently in effect.

27

Consequently, Fola's "extrinsic evidence" of state interpretations is insufficient to give Fola a permit shield. EPA's interpretation of the federal permit shield is controlling and that interpretation requires Fola to comply with all of its permit conditions.

### D. Holding Fola Liable for Violating Its Narrative Permit Condition and Water Quality Standards Is Consistent with the CWA and Its Permitting Scheme

Fola claims that Congress did not intend for Fola to be unshielded and liable for violating its permit. Fola argues that (1) in the 1972 CWA, Congress shifted the focus from water quality standards to numerical effluent limits; (2) NPDES permits were designed to translate water quality standards into numerical effluent limits; (3) Congress allowed permittees to avoid liability by disclosing their pollutant discharges in their permit application and then complying with their numerical effluent limits; (4) the CWA does not make water quality standards directly enforceable; (5) it is difficult to establish a causal link between discharges and violations of water quality standards; and (6) Congress did not intend CWA enforcement to be complicated or involve a court-developed definition of water quality. Fola Br. 24-27.

Fola's incomplete, cherry-picked description of the CWA is insufficient to support its conclusion that it is not liable for violating the permit and therefore the

CWA.  As we have shown, the CWA's language authorizes enforcement of a "permit or condition thereof."  33 U.S.C. § 1365(f)(6).  The narrative condition in Fola's permit that requires compliance with water quality standards is therefore an enforceable condition.  "[N]owhere does Congress evidence an intent to *preclude* the enforcement of water quality standards that have not been translated into effluent discharge limitations."  *NWEA,* 56 F.3d at 986 (emphasis in original). Congress's emphasis on numeric effluent limits was "intended to improve enforcement, not supplant the old system."  *Id.*  Congress recognized that water quality standards "often cannot be translated into effluent limitations."  S. Rep. No. 414, 92nd Cong., 2nd Sess. (1972), reprinted in 1972 U.S.C.C.A.N. 3668, 3675. Even after the 1972 CWA amendments, States can express water quality standards as "narrative statements."  40 C.F.R. § 131.3(b).  Compliance with such standards is "one of the [CWA's] central objectives."  *Arkansas v. Oklahoma*, 503 U.S. 91, 106 (1992).

In addition, an NPDES permit is interpreted like a contract.  *Piney Run*, 268 F.3d at 269.  The "cardinal principle of contract construction [is] that a document should be read to give effect to all of its provisions and to render them consistent with each other."  *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63 (1995).  Fola's argument for non-liability "effectively nullifies" the narrative

29

condition that prohibits discharges that cause violations of water quality standards. *Marfork*, 966 F. Supp. 2d at 684. The narrative condition "cannot . . . be interpreted such that it has no meaning." *Id.* Fola "essentially argues that the specific effluent limitations trump the incorporated water quality standard" condition. *Id.*[6]

To give effect and meaning to the narrative permit condition, and read it consistently with the numerical permit limits, it must be interpreted as requiring some level of compliance. *Marfork,* 966 F. Supp. 2d at 684. The condition means that, even when Fola's permit contains no specific effluent limits for a pollutant, Fola still cannot discharge that pollutant if it causes or materially contributes to a violation of water quality standards. *Id.* The condition is a "backstop" to protect against violations of water quality standards that the permitting authority did not anticipate would be threatened at the time of permit issuance. *Id.* at 684-85.

States are not limited to imposing numerical permit limits as the sole method

---

[6] If, as Fola argues (Fola Br. 31-32, 39 n. 9), only the discharge limits in Section A of its permit were enforceable, the other narrative conditions in Section C of its permit would also be nullified. Those conditions require Fola to, among other things, comply with all of its permit conditions, mitigate permit violations, properly operate and maintain its treatment systems, provide information to WVDEP, allow WVDEP to inspect and enter its facilities, and monitor and report its discharges and noncompliance. JA 1257, incorporating by reference 47 C.S.R. §§ 30-5.1 to 30-5.19. Thus, Fola's interpretation would eviscerate West Virginia's NPDES program.

of ensuring compliance with water quality standards.  They can also impose

narrative conditions.  Section 1370 of the CWA, which is cross-referenced in §

1311(b)(1)(C), "allows states to adopt more stringent effluent limits than those

required under the CWA."  *U.S. v. Smithfield Foods,* 191 F.3d 516, 526 (4th Cir.

1999); 33 U.S.C. § 1370.  Even if Fola's narrative permit condition is more

stringent than the CWA requires, it is consistent with the CWA, because the CWA

authorizes more stringent conditions to comply with water quality standards.  If

Fola's argument were accepted, however, it would nullify that explicit statutory

authority to adopt more stringent limits, and prevent states from choosing to

protect their waters from violations of water quality standards that they did not

anticipate at the time of permit issuance.[7]

Consequently, holding Fola liable for violating the narrative condition in its

permit is consistent with the CWA.  The district court interpreted the CWA, the

---

[7] In addition to West Virginia, Oregon, California, Georgia, Illinois and Massachusetts have chosen to exercise this authority and create a backstop narrative provision requiring permittees to comply with water quality standards. *NWEA*, 56 F.3d at 985; *Envtl. Quality Comm'n v. City of Coos Bay*, 171 Or. App. 106, 108, 14 P.3d 649, 650 (2000); *Bldg. Indus. Ass'n of San Diego Cnty. v. State Water Res. Control Bd.*, 124 Cal. App. 4th 866, 880 n. 10 (2004); *New Manchester*, 734 F. Supp. 2d at 1337 (Georgia); *Metropolitan,* 2016 WL 1588510 at *2 ("The effluent, alone or in combination with other sources, shall not cause a violation of any applicable water quality standards"); 314 Code of Mass. Reg. § 3.19(1) ("No discharge authorized in the permit shall result in a violation of the Massachusetts Surface Water Quality Standards").

31

applicable regulation, and Fola's permit correctly in accordance with their plain language.

**E.    Even if Fola's Discharges Were Protected by the CWA's Permit Shield, Those Discharges Violate SMCRA**

OVEC's SMCRA claim provides an alternative basis for enforcing Fola's violations of water quality standards.  West Virginia's federally-approved SMCRA standard requires SMCRA permittees to comply with state water quality standards and to construct and operate adequate treatment facilities to ensure such compliance.  38 C.S.R. § 2-14.5.b & c.  OVEC can enforce that performance standard against SMCRA permittees.  *Molinary v. Powell Mountain Coal Co.,* 125 F.3d 231, 236-37 (4th Cir. 1997).  The district court found that Fola violated both its CWA and SMCRA permits, and therefore implicitly found that SMCRA provides an alternative basis for finding Fola liable for violating water quality standards.  JA 571-73.

Fola argues that if this Court dismisses OVEC's CWA claim because of Fola's permit shield defense, then OVEC cannot prevail on its SMCRA claim either because of SMCRA's savings clause.  Fola Br. 54-55.  SMCRA's savings clause provides, in relevant part, that "[n]othing in this chapter shall be construed as superseding, amending, modifying, or repealing" the CWA.  30 U.S.C. § 1292(a).  Fola argues that if it is shielded from CWA liability, then it cannot be

32

found liable under SMCRA without violating that clause.  The district court did not

decide this issue because it rejected Fola's permit shield defense.  JA 389.

However, if this Court accepts Fola's permit shield defense, then it should rule that

OVEC's SMCRA claim is valid and sufficient to support the judgment below.

The savings clause does not prohibit OVEC's SMCRA claim, because (1) the

Court lacks jurisdiction to consider Fola's collateral attack on the SMCRA

standard, and (2) West Virginia's SMCRA program is consistent with the CWA.

### 1.     The Court Lacks Jurisdiction to Consider Fola's Untimely Collateral Attack on the SMCRA Standard

Fola cannot invoke the SMCRA savings clause as a defense to its violation

of the SMCRA performance standard because Fola's challenge is too late and filed

in the wrong court.  In effect, Fola claims that the SMCRA standard is

unenforceable because it is inconsistent with the CWA.  That is an untimely

collateral attack on the standard.  OSM and EPA rejected Fola's argument thirty

years ago in 1982 when they approved the federal SMCRA performance standard

requiring compliance with water quality standards.  30 C.F.R. § 816.42, *approved

at* 47 Fed. Reg. 47216 (Oct. 22, 1982).  OSM stated that its rule provides "that

discharges must comply with all State and Federal water quality laws and

regulations. This includes applicable water quality standards." *Id*. at 47220.  OSM

specifically found that this standard was "consistent with the Court of Appeals

33

ruling [in *In re: Surface Mining Regulation Litigation*, 627 F.2d 1346, 1367 (D.C. Cir. 1980)] and will help eliminate unnecessary duplication and confusion between EPA's and OSM's standards." *Id*. at 47217. EPA concurred that this standard was consistent with the CWA. *Id*. at 47221; *see* 30 U.S.C. § 1251(a)(B) (requiring EPA concurrence in OSM regulations).

Also in 1982, OSM threatened to terminate West Virginia's state SMCRA program unless it included this same performance standard in its State SMCRA program and "enacted regulations requiring that all water leaving the permit area meet Federal and State water quality . . . standards. . . ." 47 Fed. Reg. 20119, 20122 (May 18, 1982). In response, West Virginia adopted the rule that OVEC is now seeking to enforce. 47 Fed. Reg. 39821 (Sept. 10, 1982). EPA concurred that that rule was consistent with the CWA. *Id*. at 39822.

Challenges to OSM actions approving a national rule or approving West Virginia's SMCRA program are subject to judicial review only in the U.S. Court of Appeals for the D.C. Circuit or the Fourth Circuit, respectively, and must be filed within 60 days. 30 U.S.C. § 1276(a)(1). Fola's challenge is over thirty years too late and has been brought in the wrong court.

## 2. WVDEP's SMCRA Standard Is Consistent with the CWA

Even if this Court has jurisdiction, Fola is wrong that West Virginia's

34

SMCRA performance standard conflicts with the CWA. The CWA requires dischargers to comply with "any more stringent limitation, including those necessary to comply with water quality standards . . . established pursuant to any State law or regulation." 33 U.S.C. § 1311(b)(1)(C). West Virginia's SMCRA performance standard falls squarely within the scope of this section. It is a limitation requiring compliance with water quality standards and is "established pursuant to a[] State law or regulation," namely 38 C.S.R. § 2-14.5.b. Section 1311(b)(1)(C) mandates compliance with "any" state regulations that require compliance with water quality standards. Section 2-14-5.b is such a regulation. This conclusion is sufficient by itself to require affirmance of the district court's SMCRA liability decision.

As another basis for affirmance, the CWA and SMCRA each provide that States cannot enforce regulations under their delegated state programs that are inconsistent with, or less stringent than, federal requirements. 33 U.S.C. § 1370; 30 U.S.C. § 1255(b). More stringent state laws and standards are permissible. *See Penn. Coal Mining Ass'n v. Watt*, 562 F. Supp. 741, 746-47 (M.D. Pa. 1983). This statutory framework has two consequences that negate Fola's argument.

First, the federal SMCRA rule requires compliance with water quality standards. 30 C.F.R. § 816.42. In promulgating that rule, the Office of Surface

35

Mining stated that "Congress intended that surface coal mining and reclamation operations should not proceed unless all applicable water quality standards are achieved and maintained." 44 Fed. Reg. 14902, 14927 (Mar. 13, 1979). Thus, water quality standards provide the "floor" for compliance with SMCRA. If Fola's argument were correct, Fola could use SMCRA's savings clause to allow West Virginia's SMCRA program to fall through the floor, which 30 U.S.C. § 1255(b) prohibits.

Second, Fola is essentially arguing that the SMCRA performance standard is more stringent than what the CWA requires. But both the CWA and SMCRA allow states to enact more stringent state requirements. When those requirements are approved by EPA as part of delegated state programs under the CWA and SMCRA, they are incorporated into federal law and become federally enforceable by EPA and citizens. *Smithfield,* 191 F.3d at 526 ("EPA has the authority to enforce these more stringent state effluent standards once they are incorporated into a polluter's permit"); *Parker v. Scrap Metal Processors, Inc.,* 386 F.3d 993, 1006-08 & n. 15 (11th Cir. 2004) (citizens can enforce more stringent state conditions in CWA permits).[8]  If Fola's argument were correct, Fola could use the

---

[8] Fola relies on *Kodak*, 12 F.3d at 358-60, to argue that requiring Fola to meet water quality standards would impermissibly mandate a "greater scope of coverage than that required by the federal CWA." Fola Br. 43. *Kodak* is

36

CWA's permit shield and SMCRA's savings clause to nullify the more stringent

SMCRA rule. According to Fola, SMCRA's savings clause overrides the

substantive SMCRA provision that allows the more stringent SMCRA rule.

Supreme Court precedent prohibits this result. The Court has held that when

there is a statutory conflict between a substantive provision and a savings clause in

a statute, the substantive provision controls. *U.S. v. Locke*, 529 U.S. 89, 106

(2000) ("We decline to give broad effect to saving clauses where doing so would

upset the careful regulatory scheme established by federal law"). Since West

Virginia's rule is authorized by SMCRA, it cannot be prohibited by the savings

clause. That result preserves two careful regulatory schemes that both mandate

compliance with water quality standards. If Fola's argument were accepted,

however, the savings clause would be given a broad effect that would

impermissibly override the statutory provision allowing more stringent state laws.

---

distinguishable, because in that case the citizen plaintiffs challenged the discharge
of pollutants that were not listed in Kodak's NPDES permit, while here OVEC is
enforcing state water quality standards that are expressly incorporated into Fola's
permit. Such standards do not expand the scope of CWA coverage, because
compliance with those standards is required by the CWA, 33 U.S.C. §
1311(b)(1)(C), and because citizens can enforce NPDES permit conditions
regardless of whether those conditions arise from standards promulgated by EPA
or more stringent state standards that have received EPA approval. *Parker*, 386
F.3d at 1006 & n. 15. West Virginia's narrative water quality standard was
approved by EPA (JA 661) and therefore Fola's permit condition incorporating
that standard is enforceable.

In doing so, it would also mean that water quality standards would not be enforceable under either the CWA or SMCRA.  That would be a perverse result. The savings clause cannot be used in that way to override the substantive provisions of a statute and "defeat its own objectives."  *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 872 (2000).  Fola's interpretation would not "save" the CWA or SMCRA, but instead would destroy them.  In construing a savings clause, a statute "cannot be held to destroy itself."  *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 228 (1998).[9]

> **F.  The District Court Applied the Correct Method for Determining Whether West Virginia's Narrative Water Quality Standard Is Violated**

Fola argues that "the district court usurped" West Virginia's role by "us[ing] the WVSCI as the measure of compliance" with state water quality standards.  Fola Br. 49.  That argument is based on a fundamental misunderstanding of the CWA. Fola ignores EPA's role in the statutory scheme, and wrongly assumes that WVDEP's interpretation of water quality standards is controlling.  *Id.* at 49-51. The district court correctly followed EPA's interpretation of those standards rather

---

[9] The Sixth Circuit held in *ICG* that the SMCRA savings clause barred enforcement of water quality standards under SMCRA when the applicable CWA general permit did not contain a narrative condition requiring compliance with those standards.  781 F.3d at 791-92.  That decision is inconsistent with Supreme Court precedent on the effect of a savings clause on substantive statutory provisions.

38

than WVDEP's, because EPA is the agency with the authority to interpret federally enforceable water quality standards and requirements for impaired streams under the CWA.

The CWA is based on the principle of "cooperative federalism" that "allows the States, *within the limits established by federal minimum standards*, to enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Virginia Surface Min. & Reclam. Ass'n*, 452 U.S. 264, 289 (1981) (emphasis added).  Under that system of compliance with minimum federal standards, West Virginia submitted its state water quality standards to EPA for approval, including the narrative standards at issue here, and EPA approved them as a part of West Virginia's state NPDES program under the Act.  33 U.S.C. § 1313(c)(3); 40 C.F.R. § 131.21; JA 661.  As a result, those standards were "'effectively incorporate[d]' . . . into the unitary federal enforcement scheme, making State law, in certain circumstances, federal law."  *Bragg v. West Virginia Coal Ass'n*, 248 F.3d 275, 294 (4th Cir. 2001).  Thus, West Virginia's narrative water quality standards are federally enforceable requirements.

Between 2002 and 2010, West Virginia consistently determined that when a stream had a failing WVSCI score, it violated the state's narrative water quality standards for biological impairment and had to be listed as impaired under § 303(d)

39

of the CWA.  JA 649.  WVDEP specifically acknowledged that WVSCI "was a valid means in the past of assessing compliance with West Virginia's currently applicable narrative water quality criteria as applied to the aquatic life uses."  JA 659, 663, 665.  In 2012, after citizens started enforcing the narrative standard, WVDEP "flatly refused to use WVSCI scores to make such [impairment] determinations," and refused to list additional impaired streams with failing WVSCI scores on its 2012 § 303(d) List.  *OVEC v. Elk Run Coal Co.*, 24 F. Supp. 3d 532, 556 (S.D.W.Va. 2014).

In response to this refusal, EPA partially disapproved WVDEP's proposed 2012 § 303(d) list and added impaired streams that had a failing WVSCI score of 68 or below.  *Id.* at 549-50, 555-56; JA 637, 653.  EPA stated that it had "an obligation to take action to ensure that the federal requirement is satisfied."  JA 637, 658-59; see 40 C.F.R. § 130.7.  EPA specifically found that WVSCI scores below 68 "indicate that [the] waters [at and in which such scores were assessed] do not achieve the West Virginia narrative criteria as applied to the aquatic life uses," and therefore violate the narrative biological standards in 47 C.S.R. §§ 2-3.2.e and -3.2.i.  JA 652.

In addition, EPA rejected all of the arguments that Fola raises for not using a WVSCI score of 68 as the impairment threshold.  Fola Br. 49-50.  EPA stated

40

that WVDEP's "holistic approach" for measuring compliance, including its consideration of fish impacts, "does not override federal requirements" and is not "a currently applicable water quality standard for purposes of federal law."  JA 645-46, 657.  EPA rejected the argument that "fish must be used in assessments of biological condition," and found that "it is appropriate to rely on the macroinvertebrate assemblage to assess the quality of the aquatic life use."  JA 663.  EPA also rejected WVDEP's determination that a failing WVSCI score is 60.6, rather than 68, finding that lower score is "statistically unsupported."  JA 652.

The district court correctly followed EPA's interpretation rather than WVDEP's, because Congress gave EPA, not the states, the final authority to determine when a stream violates water quality standards and must be listed as impaired under § 303(d) of the CWA.  33 U.S.C. § 1313(d).  Contrary to Fola's argument, the district court did not "usurp" WVDEP's role and impose its own standard that it developed "during the course of the litigation."  Fola Br. 46, 49.  Instead, it deferred to EPA's existing interpretation because that interpretation is controlling as a matter of federal law.  This Court has "repeatedly stated that '[a] state agency's interpretation of federal statutes is not entitled to the deference afforded a federal agency's interpretation of its own statutes under *Chevron*.'"

41

*Three Lower Counties Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294, 302 n.

2 (4th Cir. 2007), *quoting GTE South, Inc. v. Morrison*, 199 F.3d 733, 745 (4th Cir.

1999).

In addition, Fola is wrong to suggest that the WVSCI score is a "court-

developed definition of water quality." Fola Br. 50. As EPA has explained,

"WVSCI is not an applicable water quality standard" but "rather a means to allow

states to assess whether narrative water quality standards are being achieved." JA

661. In that sense, WVSCI is a generally accepted scientific method that can be

used by EPA to assess whether streams are impaired. Similarly, it could be used

by OVEC's biological experts in this case to determine whether Fola's discharges

violated narrative water quality standards.

In the final analysis, Fola's methodological argument over WVSCI has no

force or significance, because Fola has not challenged the outcome of using that

method. It has not questioned the district court's finding that its discharges have in

fact caused or materially contributed to biological impairment in Stillhouse Branch

in violation of water quality standards and its narrative permit condition. Fola does

not identify any evidence that, if WVDEP's alternative method of determining

compliance were used, such as a passing WVSCI score of 60.6 rather than 68, it

would not be in violation of its permit. The highest WVSCI score recorded in

42

Stillhouse Branch since Fola began mining there was 58.17.  JA 607, 702-03, 712-

13.  In addition, as Fola acknowledges, WVDEP has never promulgated an

alternative method to WVSCI.  Fola Br. 15 ("WVDEP has not yet completed that

task").

Indeed, WVDEP "holistic approach" is "actually an *absence* of a

methodology." *Elk Run,* 24 F. Supp. 2d at 549 (emphasis in original).  "The void

created by the WVDEP in rejecting its prior practice of relying upon WVSCI

scores is not filled by any other methodology." *Id.*  WVDEP's enforcement of the

narrative biological water quality standard came "to nearly a stand-still." *Id.*

WVDEP "flatly *refused* to use WVSCI scores" to enforce compliance. *Id.* at 556

(emphasis in original).  It was this "abdication of responsibility" that required EPA

to step in and conduct its own assessment of the state's impaired waters for the

2012 303(d) list. *Id.* at 549.  That abdication also prompted OVEC to file this

citizen suit, because the "central purpose" of a citizen suit "is to allow citizens to

stop pollution when the government cannot or will not command compliance." *Id.*

at 550.

### G.    Fola Was Not Deprived of Fair Notice

A regulated party must be given "fair warning" or "fair notice" of prohibited

conduct before it may be punished criminally for that conduct. *U.S. v. Hoechst*

*Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997).[10] Fola raised this argument

below only by incorporating by reference its reply brief in an earlier case, where

the district court had previously rejected the same argument. Doc. 66-1 at 19-22;

JA 389; *OVEC v. Elk Run Coal Co.,* 2014 WL 29562 at *10 (S.D.W.Va. Jan. 3,

2014).

      Fola's current version of its "fair notice" argument is unusual. The usual

argument would be that Fola did not have "fair notice" of the conduct prohibited

by its narrative permit condition. However, as the district court ruled in *Elk Run*,

Fola's narrative permit condition is clear on its face, is based on a rule that has

been in effect since 1985, and prohibits discharges that cause violations of water

quality standards. *Id.* Those standards, in turn, prohibit discharges that cause or

materially contribute to a "significant adverse effect" on "biological components of

aquatic ecosystems." 47 C.S.R. § 2-3.2.e & i. Those standards are sufficient to

provide fair warning of what is proscribed. In *U.S. v. Akzo Coatings of Am., Inc.*,

949 F.2d 1409, 1441 (6th Cir. 1991), the court ruled that Michigan's narrative

water quality standard, which prohibited persons from "discharg[ing] into the

---

[10] *Hoechst* applied that principle to a civil penalty claim for violating a regulation, because civil penalties are "quasi-criminal in nature." *Id.* This Court has not applied that principle to a purely civil claim for prospective injunctive relief, which is all that OVEC seeks in this case. In any event, Fola's argument is meritless.

waters of the state any substance which is or may become injurious to the public health, safety, or welfare," was sufficiently specific to provide a fair warning. West Virginia's standard has comparable specificity.

Furthermore, Fola knew or should have known that its mine was impairing Stillhouse Branch.  In 2008 and 2012, WVDEP designated Stillhouse Branch as biologically impaired by ionic stress and placed it on the CWA § 303(d) list.  JA 693, 699, 712, 1014.  The 2012 list identified the cause of the impairment as "mining."  JA 1014.  Fola has the only mine in that watershed.  JA 710.

Fola does not claim that that it did not know what conduct was prohibited, or that it did not know that it was engaging in the prohibited conduct, but instead that it did not expect to be held liable for that conduct, because WVDEP had advised Fola that it would not enforce Fola's narrative condition based on failing WVSCI scores.  Fola Br. 47.  That is a defense based not on fair notice, but on estoppel, which is not a valid defense to a citizen suit.

The CWA "creates a regime of strict liability for violations of its standards." *Am. Canoe Ass'n v. Murphy Farms*, 412 F.3d 536, 540 (4th Cir. 2005).  Good faith efforts to comply are irrelevant.  *Id.*  An NPDES permittee "has an absolute duty to comply with its NPDES permit . . . regardless of oral or written representations by the permitting agency allegedly excusing compliance with permit requirements."

45

*Sierra Club v. Young Life Campaign*, 176 F. Supp. 2d 1070, 1081 (D. Colo. 2001).

WVDEP's statements about the unenforceability of Fola's narrative condition were

not incorporated into, and therefore did not change, the terms of Fola's permit.

That was this Court's holding in *Smithfield.* 191 F.3d at 526 (finding that state

board's orders "were not incorporated into nor changed the terms of the 1992

Permit" and therefore were no defense to EPA's CWA enforcement action).

Citizen plaintiffs are not bound by the inaction of agency officials. The

whole purpose of citizen suits is to allow citizens to enforce permit violations when

EPA or states fail to do so. "[A]gency inaction is precisely the circumstance in

which private action is appropriate." *EPA v. City of Green Forest*, 921 F.2d 1394,

1405 (8th Cir. 1990). "If private citizen plaintiffs were estopped from maintaining

a suit because of waivers or inaction by government officials, the effectiveness of

section 505 [i.e. the citizen suit provision § 1365] would be drastically curtailed

and its purpose defeated." *U.S. Pub. Interest Research Grp. v. Atl. Salmon of

Maine, LLC.*, 215 F. Supp. 2d 239, 260 (D. Me. 2002), *quoting Student Pub.

Interest Res. Group of N. J., Inc. v. Hercules, Inc*., 1986 WL 6380, at *8 (D.N.J.

1986). WVDEP has abdicated its responsibility to enforce compliance with the

narrative biological water quality standard, and OVEC has therefore stepped in to

enforce such compliance. *Elk Run,* 24 F. Supp. 2d at 549-50. Consequently,

Fola's "fair notice" argument is meritless, and is nothing more than a veiled and impermissible attack on the citizen suit provision.

For these reasons, the district court's liability decision should be affirmed.

## II.    The District Court's Decision on Relief Should Be Affirmed

### A.    Standard of Review

This Court reviews an order granting an injunction for abuse of discretion, reviewing factual findings for clear error and legal conclusions *de novo*.  *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 125 (4th Cir. 2011).  A court "has abused its discretion if its decision is guided by erroneous legal principles."  *Brown v. Nucor Corp.,* 576 F.3d 149, 161 (4th Cir. 2009).

### B.    The District Court Properly Ordered Fola to Reduce Its Discharges of Conductivity into Stillhouse Branch to 300 µS/cm or Less

Fola does not challenge the district court's finding that Fola's discharges caused or materially contributed to failing WVSCI scores, and therefore violated the narrative condition in its permits.  Fola Br. 51.  Instead, Fola challenges the remedy that the district court imposed to correct that violation.  In the CWA and SMCRA, Congress granted district courts the power to enforce permit conditions. 33 U.S.C. § 1365(a); 30 U.S.C. § 1270(a).  The district court found that "injunctive relief is necessary and appropriate to remedy Defendant's violations."  JA 1033. The district court found that all four equitable factors supported issuance of an

47

injunction "requiring Defendant to comply with water quality standards."  JA
1030.

### 1.    The District Court's Order Is Reasonably Calculated to Remedy Fola's Permit Violation

Fola argues that the district court had no authority to order Fola to
"implement such measures as are necessary to reduce the level of conductivity in
Stillhouse Branch to 300 microsiemens per centimeter (300 μS/cm) or less or to
achieve passing WVSCI scores in Stillhouse Branch."  JA 1225.  The district court
found that if the conductivity in a stream exceeds 300 μS/cm, the stream is likely
to have a failing WVSCI score, and therefore is likely to violate West Virginia's
narrative water quality standard for biological integrity.  JA 592 ("the EPA found
that in central Appalachian streams, when conductivity reaches 300 μS/cm, it is
more likely than not that the subject stream will be biologically impaired"); JA 610
("experts anticipate extirpation once conductivity levels surpass 300 μS/cm").
That finding supports the district court's order, because Fola is unlikely to correct
its permit violation unless it reduces the conductivity in Stillhouse Branch to less
than 300 μS/cm.

Factual findings from a bench trial may be reversed only if they are clearly
erroneous.  *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502 (4th Cir. 2016).
Fola does not even attempt to show that the district court's finding was factually

48

unsupportable. Instead, Fola mischaracterizes what the district court did as "illegally adopt[ing] a water quality standard." Fola Br. 51. The district court did no such thing. It made findings based on the evidence presented at trial and then exercised its statutory and equitable power to enforce the permit condition that Fola was violating. 33 U.S.C. § 1365(a).

The CWA authorizes a district court to order relief that will achieve compliance with the CWA. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 318 (1982). In fashioning equitable relief for an established wrong, federal courts have broad latitude, can impose affirmative obligations that are "reasonably calculated" to remedy the violation, and are not limited to merely declaring that a permit requirement exists and repeating that it must be followed. *Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1000 (9th Cir. 2000); *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 268 (3d Cir. 2005). The district court did not abuse its discretion in imposing a requirement to reduce conductivity in Stillhouse Branch to 300 µS/cm or less. That requirement is consistent with Fola's permit and is reasonably calculated to achieve compliance with the water quality standard for biological integrity.

49

**2.     The District Court's Order Targets Fola's Discharges of a Mixture of Chemical Ions that Are Actionable Discharges of Pollutants Under the CWA**

Fola next argues that the district court had no power to require Fola to reduce the conductivity in its discharges, because conductivity is not a pollutant under the CWA, and the CWA only prohibits illegal discharge of pollutants.  Fola Br. 52.  Fola further argues that the district court cannot use conductivity as a "proxy" for the ionic chemicals that cause increased conductivity, and that the identification of particular pollutants was essential to OVEC's claims.  *Id.* at 52-53.

The narrative permit condition and water quality standard that OVEC is enforcing impose liability if a person discharges pollutants containing "wastes" and "materials" that "cause or materially contribute" to biological impairment.  47 C.S.R. §§ 2-3.2.e, 3.2.i.  The standard requires a discharge of pollutants, but does not require the identification of specific chemicals or ions.  The district court found that Fola discharged a mixture of ionic pollutants that is characteristic of alkaline mine drainage from West Virginia valley fills and that is known to cause or materially contribute to biological impairment in central Appalachian streams, such as Stillhouse Branch.  JA 570.  Fola does not challenge that finding on appeal.

In any event, OVEC submitted direct water quality measurements showing that Fola's discharges from its Outlet 029 into Stillhouse Branch contained

50

calcium, sulfate, high conductivity, and pH levels in the alkaline range. JA 700. EPA has designated sulfate, calcium, total dissolved solids, and pH as pollutants under the CWA. 40 C.F.R. Part 122, App. D, Table IV; 40 C.F.R. § 123.45, App. A, Group I Pollutants; 40 C.F.R. § 401.16. In water, sulfate and calcium are major constituents of total dissolved solids. *See Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 698 (10th Cir. 2010); JA 1020 ("conductivity represents the combined concentrations of all different dissolved ions" and "the elevated dissolved pollutants most commonly associated with mining discharges are sulfate and bicarbonate alkalinity"). OVEC's experts relied on four peer-reviewed studies demonstrating that when surface mines in central Appalachia discharge alkaline mine drainage containing high sulfates and conductivity, that drainage is likely to have the characteristic four-part ionic mixture that causes biological impairment.

The four studies show that the primary distinction between high conductivity streams in West Virginia is whether they are dominated by sulfate or chloride ions. In its Benchmark study, EPA used these two ions as a screening tool to identify sites with harmful alkaline mine drainage. Based on field data, EPA excluded sites dominated by chloride and included only sites dominated by sulfate. JA 758 (sites "were excluded if the salt mixture was dominated by [chloride] rather than [sulfate]"). Fola's site is dominated by sulfate, not chloride. JA 537, 700. Using

51

the sulfate-dominated sites, EPA developed an aquatic life benchmark for conductivity that can be applied to waters throughout the Appalachian Region that contain the harmful sulfate-dominated salt mixture. JA 748, 753 ("this benchmark is limited to two contiguous regions with a particular dominant source of salinity"). In its peer review of that Benchmark, EPA's Scientific Advisory Board stated that "the relationships between conductivity and specific ions in the current report all appear to be strong and similar in distribution, suggesting that *ion ratios are relatively similar across the sites.*" JA 672 (emphasis added).

A second study by Cormier and Suter (two authors of the Benchmark) relied on this same ionic distinction to find a causal relationship between alkaline mine drainage and biological impairment in central Appalachian streams. That study specifically included the Stillhouse Branch watershed. JA 678-79. The authors stated that "there are sources of the mixture of dissolved ions that are widespread in the region and can be differentiated from sources of other mixtures" and that "[m]ultiple studies are consistent in the description of the ion types associated with different sources." JA 514, 679. Specifically, "conductivities above 500 µS/cm contain high levels of the ions of [calcium, magnesium, bicarbonate and sulfate], . . . which is consistent with surface coal mining and valley fill sources." JA 679. As a result, "this causal assessment relates primarily to mixtures of ions typical of

52

alkaline coal mine drainage and associated valley fills rather than sources that are not coal-related." *Id.* Fola's Stillhouse site falls in this category, since it is a surface coal mine/valley fill source with alkaline mine drainage and conductivity over 500 μS/cm. That study further stated that:

> The evidence supports the causal relationship by showing that there are sources of high conductivity with a consistent matrix of ions. Both mined and unmined sites have similar proportions of calcium, magnesium, bicarbonate, and sulfate but very different concentrations. The difference between the ionic composition of mined watersheds and watersheds with other sources of ions such as brines is very large. The evidence from the West Virginia database and two other Appalachian studies consistently supported the ionic makeup associated with land disturbance, especially surface mining.

JA 679-80, 515. The authors concluded that "a mixture containing the ions [calcium, magnesium, bicarbonate and sulfate], as measured by conductivity, is a common cause of extirpation of aquatic macroinvertebrates in Appalachia where surface coal mining is prevalent." JA 509, 676.

A third study by Bernhardt and King used a different statistical method and found that biological impairment at West Virginia mine sites is "likely" when sulfate concentrations exceed 50 mg/l. JA 673, 499. Fola discharged *forty times* that amount of sulfate from its Outlet 029 into Stillhouse Branch. JA 700 (2000 mg/l).

A fourth study by Kunz used reconstituted water mixtures to match the

53

discharge water found at three different West Virginia mine sites. JA 687, 525, 563-64. All three sites had high conductivity, but two sites were dominated by sulfate and alkaline mine drainage and one site had neutralized mine drainage. *Id.* One of the alkaline sites is located at the same Fola mine as the one in this case. It discharges into the Boardtree Branch watershed, which is directly adjacent to the Stillhouse Branch watershed. JA 525. The study found that the Boardtree drainage water was toxic to a mayfly at a conductivity of 800-1300 µS/cm. JA 690. The conductivity in Fola's discharges to Stillhouse Branch was 2826 µS/cm—*more than twice as high*. JA 700.

Thus, these studies show that (1) in this region, if a site is impacted by surface mining and valley fills, and there is high conductivity and sulfate at that site, it is more likely than not that biological impairment will result, and (2) Fola's Stillhouse site falls within this category of impaired sites. Relying in part on these studies, OVEC's two expert biologists testified that Fola's discharges into Stillhouse Branch contain high-conductivity alkaline mine drainage that is characteristic of mines in the Appalachian region and that this drainage is the cause of biological impairment in Stillhouse Branch. JA 407, 410-11, 450, 532-33. The district court properly credited this expert testimony and required Fola to reduce the conductivity in its discharges. JA 556-70, 589-612.

### 3.     The District Court Did Not Have to Follow EPA's Permitting Rules for Indicator Parameters

Finally, Fola argues that the district court was bound by EPA's permitting rules and those rules do not authorize a state agency to use an "indicator parameter" like conductivity to protect water quality unless the agency identifies the specific chemical pollutant that causes a violation of a narrative water quality standard.  Fola Br. 53.  The district court correctly held that those rules do not apply to judicial enforcement of an existing permit condition that prohibits violations of a narrative water quality standard.  JA 569.  The district court is the enforcement authority, not the permitting authority.  EPA's rules at 40 C.F.R. Part 122 only apply to the permitting authority when it is deciding what effluent limits must be included in an NPDES permit.  40 C.F.R. § 122.1(a).  OVEC did not ask the court or WVDEP to impose a new effluent limit in Fola's CWA permit.  OVEC sued Fola in federal district court to enforce its existing permit condition that requires Fola to comply with narrative water quality standards.

In imposing that permit condition, WVDEP decided that NPDES discharges from coal mining operations must comply with water quality standards.  Those standards may be expressed as "narrative statements, representing a quality of water that supports a particular use."  40 C.F.R. § 131.3(b).  WVDEP's narrative statement protects the biological integrity of its waters.  The district court found

55

that to enforce that requirement, conductivity must be 300 µS/cm or less.  Nothing

in § 122.44(d)(1)(vi) prevents that result.

### 4.    The District Court's Order Is Consistent with SMCRA, Which Does Not Require Proof of a Discharge of CWA Pollutants

One of the SMCRA rules that OVEC is enforcing provides that a "discharge

from areas disturbed by surface mining shall not violate effluent limitations or

cause a violation of applicable water quality standards."  38 C.S.R. § 2-14.5.b.  The

other rule OVEC is enforcing provides that adequate treatment facilities must be

installed "to treat any water discharged from the permit area so that it complies

with the requirements of subdivision 14.5.b."  *Id.,* § 2-14.5.c.  Thus, under

SMCRA, Fola cannot discharge any water from its permit area that causes a

violation of water quality standards.  This prohibition is not limited to the

discharge of specific CWA pollutants, and covers any type of water pollution,

including the harmful ionic mixture that Fola discharged.  Consequently, even if

the CWA required the identification of specific pollutants, SMCRA does not.  The

district court's relief order as to Stillhouse Branch is therefore consistent with

SMCRA.

### Conclusion

The district court's decision holding Fola liable for violating its CWA and

56

SMCRA permits and granting injunctive relief should be affirmed.

Respectfully submitted,

Joseph M. Lovett
J. Michael Becher
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 645-9006

*s/James M. Hecker*
James M. Hecker
Public Justice
1620 L Street, N.W. Suite 630
Washington, DC 20036
(202) 797-8600

*Counsel for Plaintiffs-Appellees*
*Ohio Valley Environmental Coalition, et al.*

57

## Request for Oral Argument

Because of the importance and complexity of the issues presented, Plaintiffs-Appellees Ohio Valley Environmental Coalition, <u>et al.</u>, respectfully request oral argument.

## Addendum of Regulations

## 47 C.S.R. § 30-5.  Conditions Applicable To All Permits.

The following conditions apply to all WV/NPDES permits.  All conditions shall be incorporated into the WV/NPDES permits either expressly or by reference. If incorporated by reference, a specific citation to this rule must be given in the permit.

5.1.  Duty to Comply; Penalties.

5.1.a.  The permittee must comply with all conditions of a WV/NPDES permit.  Permit noncompliance constitutes a violation of CWA and Article 11 and is grounds for enforcement action; for WV/NPDES permit modification, suspension or revocation; or for denial of a WV/NPDES permit reissuance application.

\* \* \*

5.1.f.  The discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards adopted by the Department of Environmental Protection, Title 47, Series 2. Further, any activities covered under a WV/NPDES permit shall not lead to pollution of the groundwater of the State as a result of the disposal or discharge of such wastes covered herein.

59

**38 C.S.R. § 2-14.  Performance Standards.**

In addition to the requirements of the Act, the following performance standards shall be applicable to both surface and underground mining operations.

\* \* \*

14.5.  Hydrologic Balance.  All surface mining and reclamation activities shall be conducted to minimize the disturbance of the hydrologic balance within the permit and adjacent areas, to prevent material damage to the hydrologic balance outside the permit area, to assure the protection or replacement of water supplies, and to support the approved post mining land use.

\* \* \*

14.5.b.   Effluent Limitations.   Discharge from areas disturbed by surface mining shall not violate effluent limitations or cause a violation of applicable water quality standards. \* \* \*

14.5.c.  Treatment Facilities.  Adequate facilities shall be installed, operated and maintained using the best technology currently available in accordance with the approved preplan to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection.

60

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____       Caption: _____

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ ]    this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ]    this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____

04/13/2012
SCC

61

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing brief was served by CM/ECF on this

20th day of May 2016 on the following:

M. Shane Harvey
Robert G. McLusky
Jennifer Hughes
Jackson Kelly PLLC
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301

*s/James M. Hecker*